with us today. She started off in the U.S. Attorney's Office and then was a professor of law for a few years, then was a state trial judge, then in 1980 was appointed to the District Court in the Western District of Washington, where she served over 20 years, and then was Director of the Federal Judicial Center, which she served for almost 10 years. And since then, she has been sitting actively with the District Court in Washington, D.C. as a visiting judge, and we are delighted to have you, Barbara Rothstein. First case is Jones v. the Governor of Florida, Mr. Patterson. Good morning, Your Honors. May it please the Court, Pete Patterson for the appellants. In 2018, the people of Florida made the historic decision to extend the franchise to felons upon completion of all terms of their criminal sentences. The plaintiffs are here today as individuals who have not completed all terms of their sentences, and they are complaining that the people of Florida did not go far enough. But the Equal Protection Clause does not support their claims, and the District Court's decision to the contrary must be reversed. And that is for three primary reasons. First, plaintiffs have not shown intentional discrimination. Second, this case does not involve the fundamental right to vote. And third, this case does not involve the deprivation of anyone's right to vote, but rather the extension of the right to vote to previously ineligible individuals. On the first point, Your Honors, this Court made clear in the hand decision in the context of felon reenfranchisement, an Equal Protection Claim requires a showing of purposeful discrimination. The plaintiffs here have not even argued for intentional discrimination, so their claim fails for that reason alone. And indeed, it would make no sense to allow a disparate impact theory here when all agree that if the discrimination were on account of race, disparate impact would not be sufficient. And yet the argument here is that disparate impact is sufficient for discrimination on the basis of wealth, which unlike race, is not a suspect classification. That would make no sense, and that is not the law. As I said— Are disparities on the grounds of wealth ever treated to heightened scrutiny analysis? Yes. There are two narrow circumstances in which they're treated to heightened scrutiny analysis. One is the Bearden line of cases, which holds that if a person is going to be thrown in jail because of their lack of wealth, then a heightened form of scrutiny will apply. The other exception is involving access to appellate proceedings in criminal cases and in cases involving the termination of parental rights. In that other narrow circumstance, the United States Supreme Court has held that heightened scrutiny applies. But as this Court made clear in the Walker case, those are narrowly circumscribed exceptions, and the Court should not to a new circumstance, particularly since they are out of step with the Washington v. Davis line of cases, which postdated the Griffin line and some of these other cases, showing that you have to show intentional discrimination. Two questions. Yes. One, if the record shows that a very substantial set of these potential voters are unable to pay, would it not then fall under the analysis of the MLB case, where it expressly held that Washington v. Davis and intent did not apply? It would not fall under the analysis of MLB. First, Your Honor, that was within the narrow exception for access to judicial proceedings. And this case has nothing to do with judicial proceedings. And second, Your Honor— So that is more important than the right to vote? Excuse me, Your Honor? That access to appeal in a criminal proceeding is more important than the right to vote? Well, no, Your Honor, but this case does not involve the fundamental right to vote because the plaintiffs, the moment they were convicted of their felonies, forfeited the fundamental right to vote. Yes, but the right to vote has now been reinstated. And does it lose that fundamental characteristic of something really important once it's reinstated, that it can be treated not to even be as much as the right to get a transcript on appeal? It's been reinstated in a very specific circumstance, and that is upon the completion of all terms of a felon's sentence. When the justice of their individual case, as determined in their criminal proceeding, has been done, that is when the right to vote is reinstated. Until that point, it is not reinstated. As Justice O'Connor said in the Harvey decision, this is just like the allocation of any other discretionary governmental benefit. Didn't Justice O'Connor also say that in that case, the issue of being indigent wasn't for her? In fact, she said that she wasn't ruling on what would happen if there were no indigent plaintiffs in that case, right? Well, they were not making that as-applied claim in that case. But what she said is that we're not going to determine whether that would pass rational basis review as applied to those specific individuals. But that made clear that the analysis getting to that point would apply, including there is no reason to distinguish between different classes of felons. Let me ask the question this way. Assuming that you're right, that we have to review this case through the prism of rational basis scrutiny rather than some form of heightened scrutiny, as applied to these 17 plaintiffs, how is it rational to demand before reenfranchisement that they do the impossible, if indeed it is really true that they simply cannot make restitution? Not now, not in any foreseeable period. Let's just assume that for my question. How is it rational to denude them of reenfranchisement at the same time that you automatically reenfranchise those who are capable of paying a restitutionary obligation? Well, Your Honor, it's rational for the voters of Florida, the people of Florida, to insist that reenfranchisement is conditioned upon the repayment in full of a felon's debt to society regardless of that felon's wealth. And there is no wealth classification in this provision. It is silent as to wealth. The only wealth classification would be in the district court's injunction, which requires the state of Florida to take into cognizance ability to pay. But it is rational. The line that the people of Florida drew is entirely rational and perhaps the most rational line in terms of when a felon will be reenfranchised. Let me come back to my question. It seems to me it's all how you frame it. I'm asking whether it's rational with respect to some subset of these felons to continue to denude them of the right to vote simply on the grounds of impecuniousness, if indeed it is clear they simply cannot pay. Absolutely impossible. Why would that be rational as to them? I understand the argument that that's not the way to frame the question, that we have to ask more generally, is it rational to apply a neutral rule of general application? But before we get to that, I want you to help me just with my narrow, specific question, which I expect you will say is the wrong question, and maybe it is. But insofar as you ask, whether it is rational not to reenfranchise someone who simply cannot pay, and there's no expectation that he will be able to pay, what interest of the state is being satisfied by doing that? It doesn't deter, it doesn't incentivize, it doesn't rehabilitate, it doesn't make anybody whole who otherwise you were obliged to make whole. As to those people, how is it rational? Yes, Your Honor, so accepting the premise of the question, the first reason it's rational is under just a retributive theory of justice, that these individuals are not going to be restored to the voting community until their debt to society in full has been paid. Bearden at page 2072 in the right column says, in language indicating that no one would suggest that a state can punish solely because or on the basis of poverty, does it not? I believe you are correct about that, Your Honor. And does that not also make a sound common sense? In that context, and Your Honor, here, no one is being punished. The punishment of disenfranchisement… I just thought you said that that was retribution and punishment was what you were asserting as a legislative purpose. That is the purpose of their initial punishment upon being convicted, and that is when they are disenfranchised. The laws being challenged here do not disenfranchise anyone. They only enfranchise… But isn't it punitive, counsel, to say, I'm not going to reenfranchise this group. I will automatically reenfranchise that group. I thought that is part of a lawful sanction but it is a sanction. It is a punishment, isn't it? Well, the sanction came for these plaintiffs many years ago when they committed and were convicted of their felonies. And as the Supreme Court made clear in the Katzenbach case, there is a difference between laws that disenfranchise and then reform laws that reenfranchise. And in that latter category, the state has particularly broad discretion to draw lines and to say, okay, here is… our reform is going to go this far. But the state still needs a legitimate interest in passing a certain category. And what is the legitimate interest in keeping people from voting on the grounds that they can't afford to pay their fines or whatever? Well, again, that's not… these laws are not drafted in terms of whether individuals can afford to pay or not. It is a bright line standard that says until justice has been done in full, we are not going to welcome you back into the voting community. And that's perhaps the most rational line that the people of Florida… I can accept that as a general observation. The problem that I'm having is getting an answer to my question, which is, is it rational to say I'm going to denude this group from voting, whereas the other group similarly situated gets to vote simply on account of the inability to pay? Is that rational? Yes, that is rational under the… again, seeing that full justice is done, but also under alternative rationales, including ensuring full repayment of the deaths to the greatest extent possible. As the Sixth Circuit held… How you don't get blood out of a stone. Well, as the Sixth Circuit held in the Bredesen case, on the margins, if you have a bright line rule, it's going to encourage people more. Of course, that's right if you ask the question generally, but doesn't seem to be right if you ask the question as applied. Aren't you required to convince us that it's inappropriate to ask the question the way I fashioned it, and it has to be asked more generally? Neutral rule, general application, there's a rational basis because it incentivizes payment, but I don't understand how that would apply to a subclass that you can't incentivize. Well, and as a follow-up to that question, and I'm posing this also to the other side so they can be thinking about it and answer, but I think, I'm not sure because I haven't researched this yet, Nat Zibria, but I think there are cases in the as-applied context that do not look at solely that general perspective, but rather look at it as applied to these people, to this plaintiff. In other words, the statute is fine facially, but as applied to these people, it is not. Are there not such cases? Not in the rational basis review, and I think that is the principal answer in terms of the way you frame the question. Under a rational basis analysis, the legislature is entitled to be over-inclusive or under-inclusive. This is not a least restrictive alternative inquiry, but even putting that to the side, so I think that is the main answer. Second thing, even if there are not such cases in the as-applied, like that last question, if these provisions, constitutional and implementing statute, if these provisions in effect deprive a very substantial segment of this group of felons potentially re-enfranchised, would that not, number one, both look toward intent, and two, no, your honor, and the reason being that the, as the Florida Supreme Court has said, the people in Florida, their chief purpose was to re-enfranchise felons, but only upon completion of all terms of sentence, so that was the fundamental law. Suppose the constitution and felons have been in jail, and they don't have the assets, and they have no income, and they will not be able to pay fines or restitution over, let's say, $500. We recognize that that comprises 80% of the group at issue, but we nevertheless hold. Yes, and you think it would still be all right? That would still be all right, your honor. Would that not be an express intent to disenfranchise solely on the basis of poverty? No, your honor, because as, going back to the Katzenbach case, Justice Brennan for a unanimous United States Supreme Court, there is a distinction between laws that disenfranchise, which this law doesn't. The disenfranchisement had already happened, and laws that enfranchise, that extend the franchise to a group of citizens that were previously ineligible, that is what these laws that are being challenged do. They are enfranchising. We are not re-enfranchising just a group, and there's a rational basis for distinguishing between this group and another group. We are, in this case, re-enfranchising a felon who was convicted of crime X, sentenced to five years, three years probation, $1,000 fine. He has assets, he pays his $1,000 fine and serves his time in probation, and he can vote. The felon in precisely the same situation, the same crime, the same sentence, the same probation, the same fine, and he cannot pay. Precisely the same situation, and yet he is deprived of the vote. Well, it's not precisely the same situation because that person has not repaid their debt. Precisely the same situation except for punishment on account of poverty. Not on account of poverty, on account of the justice in the case. Well, the same justice. In the two cases, the same justice, is there not? Right, and in one case that justice has been done, in the other case it has not. Going back to the Katzenbach case, in that case it was... In other words, he is responsible for, culpable for his poverty. He was culpable for his or her criminal conduct that led to that sanction. Aren't you really assuming that nothing has happened between taking the vote away? There's been a reinstatement. That makes it different. They now are on an equal thing about whether they're all going to be able to vote with the reinstatement. And the only difference between the two people you've just heard, the vote's been reinstated for both of them. One of them can't vote because he hasn't paid the fine, and he hasn't paid the fine because he can't afford to pay the fine. Correct, Your Honor, and that is as both the Washington Supreme Court and the Sixth Circuit have held, there is a rational basis for that, and that is, getting back to Judge Marcus's question, same justice being done, having a bright line rule so that if you have an exemption for these... Well, let me ask you the question this way, counsel. Does the record reflect what proportion of otherwise re-enfranchised felons are able to pay, and how many are not? Here is what, there are two relevant data points in the record that I believe, Your Honor. One is on page 957 of the supplemental appendix, which is the over 20% have zero fines, over 60% have $1,000 or less, and over 95% have $5,000 or less. Right, I understand that, but what I'm asking is, is there anything in the record that tells us what percentage of the whole is able to meet their obligations, and how many cannot? No, there's nothing in the record specifically to that. The closest thing is on page, I believe, document 152 at 28, which is a Department of Corrections report that shows that the number that are at risk of being collected, and the plaintiffs say it's 85.9%, I believe it is, but if you look at that document, only 22.9% of that is because of indigenous... That was the Dan Smith stuff, the expert... Well, the first thing with the Dan Smith stuff, this was a Department of Corrections report about... Let me ask the question this way, who has the burden of otherwise establishing that the exception swallows up the rule? Do you know what I mean by putting it that way? Yeah, the plaintiffs have the burden, of course, and they have to disprove any rationally conceivable purpose... So, your argument boiled down to its finest point is, regardless of whether it's rational as to some, as applied, as a general rule, neutrally applied, it's rational and makes sense. And you can't go beyond that and ask whether it's rational as applied to some subset. That's your position. Well, that is my position that, yes, you have to judge the classification that the legislature made. Is that a rational classification? A. But then B, I believe it also is rational, even if you were to narrowly focus on the 17, as you mentioned, both for, again, seeing that justice is being done in full, ensuring that you're not opening up other people potentially not paying because there's an exception. And then also, I didn't mention administrative burdens associated with making these case-by-case determinations, but I see my... I'm going to shift gears and address whether or not this is, in fact, a fundamental right or something close to it. It seems to me that our Shepard case in the form of Fifth Circuit is distinguishable because here, in that case, it was just a flat-out disenfranchisement. There was a procedure for Texas felons to be relieved of that, but not for federal felons. Here, Florida has automatically re-enfranchised a whole group of people, and you have the situation, like I talked about a minute ago, where you have a felon in precisely the same situation as who can vote, as the person who can't vote, with the sole exception of poverty or inability to pay. It seems to me that those cases that have said this is not a fundamental right, all with the exception of the Sixth Circuit majority and the Washington State Madison case, with the exception of those two. Every other court that has said that has not been in a situation where you have this automatic re-enfranchisement and then a discrimination in the re-enfranchisement based on poverty. Furthermore, it seems to me, just as a matter of common sense, that the nature of the right to vote cannot change. The right to vote is a fundamental right. We know that. The Supreme Court said that in HARPA and has said it many, many, many times. The right to vote is a fundamental right. The issue and the proper question is who is entitled to that fundamental right? And we know that a felon, when he is disenfranchised, when the state disenfranchises the felon, then he no longer has a fundamental right. He no longer has a right to vote at all. But the nature of the right to vote doesn't change on the basis of who is entitled to it and who is not entitled to it. Therefore, it seems to me in this case, what is at stake for these felons who are automatically re-enfranchised except for poverty? What is at stake is a fundamental right to vote, is it not? Does that not make common sense? It's not at stake. And for the reason that Justice O'Connor said in the Ninth Circuit is that until the qualifying conditions are met, the fundamental right to vote is not reinstated. She did not address this question. Well, she didn't address. She then just then said, well, that is the reason that rational basis applied. Right. What she said. And then I said, I'm not going to determine whether there's a rational basis as applied to those who can't afford to pay. But she didn't indicate that it would be a different sort of analysis, that it would implicate the fundamental right to vote. And the Washington Supreme Court in the Sixth Circuit, the reason that those are the only cases addressing this is because those are the only cases. So every appellate court that has addressed this has gone the state of Florida's way and held that this is an entirely rational distinction. And I would submit it's even more rational than the distinction at issue in the Shepard case, which was if you finish probation under Texas court supervision, you could regain your right to vote. But if you finish your probation under a federal court sitting in the state of Texas for the same exact crime with the same exact punishment, you are precluded forever from getting your right to vote back. So I would submit that if anything, that's less rational than the line that is at issue here. Let me ask the question this way. And I've got three for you. One, just going back to rational basis review, could the law demand community service from a defendant as a condition to re-enfranchisement where the defendant is otherwise so disabled as not to be able to perform community service? If the question were, if the line was... Judge demands community service on the front end. Defendant goes to jail for 15 years, comes out paraplegic, cannot perform the obligation of community service. He hasn't performed all of the terms and conditions of a lawful sentence imposed by a court. By your lights, he would not and could not be re-enfranchised. Is that rational? If it were a situation like this where it was a general classification... Yeah. Take my hypothetical in the context of neutral rule general application. Yes. Then that would be rational because again, under rational basis review, it's not the least restrictive alternative. There can be over-inclusivity and under-inclusivity. And while you may hope that... So it gets back to the proposition that you can't ask the question in the particular as applied, you must ask the question solely in the general form because you would have to concede, would you not, that if you ask the question as applied, the defendant who's paraplegic and cannot otherwise perform an obligation of community service and thereby is denuded of the right to vote, makes no rational sense, right? Maybe in that case, your honor, I'm not sure. How could that make any rational sense? Well, again, if the line is completion of all terms of sentence, and that is a term of that person's sentence and they haven't completed it, even if they cannot complete it, it's the same if a person is put in jail, if their sentence is life in prison, under the terms of this law, they're never going to be able to regain... Sure, but isn't the right analog there is the defendant who pays 10 grand to the state and is incarcerated for life can vote and the defendant who's in pecunious cannot? That wouldn't pass constitutional muster, would it? I'm sorry, your honor. I didn't understand. Let's just suppose two defendants are incarcerated for life. The law will re-enfranchise the one who's able to pay a stipend of 10 grand, but not the other who can't. No, because that would be a naked wealth classification would be arbitrary and irrational. So it's not tied to that person's sentence. It's not tied to justice in their case. And I think, your honor, what the other side is really doing is they're attacking the underlying sentence itself. They're saying it's not rational to apply this sentence to me because I can't afford to pay it. I think what they would say is it's not rational to refuse to re-enfranchise this group when you're going to re-enfranchise the other group where the only distinction or disparity is on account of wealth. Well, I think it's all how you frame the question. Right. I understand that is what they're saying, your honor. But if the condition is repayment of the debt to society in full, then they're really having an issue with that. But I see I'm well over my time. I'm happy to answer any additional questions. Two brief ones. One, what are the dates here that we're dealing with in so far as we have to render a case? As I understood it, the district judge stayed the effect of his ruling as to the second prong of his injunction up until February 11th. If we do nothing until the 11th and the stay is lifted, what happens? What's the impact on the state? Well, March 7th, early voting begins. For the primaries. For the primaries. So the plaintiffs could begin voting come March 7th. So that is kind of the... So if the stay is automatically lifted as of the 11th, what does the state do with respect to the 17 applicants? Well, if the stay is lifted and injunction... Right, it's automatically lifted by the operation of its own terms. Right. Well, nothing is going to happen then because the state would be enjoined from doing anything. So you have to let them vote. It's the bottom line. Yes, yes. Did the injunction require that they be allowed to vote or did it say that the state had to provide a procedure whereby they could prove that they are entitled to vote? Well, the injunction for these specific 17 plaintiffs was that they be allowed to vote because the finding was that they can't afford to vote, afford to complete their... But clearly the injunction would extend, or not clearly, do you think the injunction would extend beyond these 17 people? No, because nobody but the court was very clear that it only applies to these 17 people. So, as of February 11th, these 17 people would be able to register to vote, but it wouldn't extend to any other people in the same position? No. I thought they've already registered. Yes, they've already registered. So that part of the order, the Secretary of State, I'm reading from paragraph three of the district court order, the Secretary of State must not take any action that both, A, prevents a plaintiff from applying or registering vote, and B, it's based only on failure to pay a financial obligation the plaintiff asserts the plaintiff is genuinely unable to pay. The plaintiffs to which this paragraph applies are, and then he lists at least 15 of them. Yeah, so we haven't done anything to inhibit these plaintiffs' ability to register. It's my understanding that they have registered, but they can obviously speak to that. So, the bottom line is, if the stay automatically is lifted, and it would be by the 11th in the absence of any action here, they would be, the state would be obliged to let them vote in the primary between March 7th and the 17th. Yes, and as the district court acknowledged, if that is, if we are correct on the law and that is allowed to happen, that would be both, A, an irreparable harm, and B, against the public interest. The district court acknowledged it all essentially turns on the merits. Thank you. Thank you. Thank you, sir. Ms. Julie Ebenstein. Good morning, your honors. May it please the court. My name is Julie Ebenstein on behalf of the plaintiffs. My colleague and I will address the court in two parts. I will address wealth discrimination and voting, and then Ms. Lang will speak to the Griffin-Bearden line of cases more broadly and any questions about jurisdiction. This case is a straightforward application of a well-established principle. Access to the franchise cannot depend on affluence. This court sitting on Bonk and Johnson already applied that principle from Harper in the context of rights restoration in Florida. Johnson did not establish what scrutiny, though, did it? The court in Johnson did not establish what level of scrutiny. It simply said that access to the franchise cannot be conditioned, but that decision in Johnson applying Harper relates to other Supreme Court precedent. For example, the exception described in MLB versus SLJ and the Lubin and Bullock cases that are also mentioned in MLB. There, what the court said was that when it comes to elections, the basic right to participate in political processes as voters and candidates cannot be limited to those who can pay for a license. Essentially, that voting is different. Wealth cannot be the determining factor on whether or not somebody is able to participate. The two cases that are also addressed in MLB, Bullock and Lubin, are consistent with the same principle that a heightened level of scrutiny applies. In both, the court invalidated filing fees, candidate filing fees, on the basis that the plaintiffs there were unable to pay and there was no reasonable alternative means of access to the ballot. The close scrutiny was applied to invalidate both of those laws on the same principle as in Harper, which is that access to the franchise cannot be dependent on an individual's ability to pay, that that affects. Let me tell you the problem that I have with Johnson, and maybe you can help me with it. It certainly states at a high order of abstraction that access to the franchise cannot be made to depend on an individual's financial resources, citing Harper. But what happened in that case, there was no automatic reenfranchisement for one group and not another. The disparity in that case was with respect to applying for clemency before the clemency board, a wholly discretionary act on the part of the governor and the members of the clemency board. We don't have that here. In that case, the disparity inhered in the fact that if you made the restitution, if you had the wealth, you didn't have to have a hearing. You could apply on paper. But if you didn't, you had to have a hearing in a wholly discretionary way. I don't think Johnson takes you all that far. Maybe I'm misreading it in that sense. But when you look at the holding in Johnson, the bulk of the case, it's a discrimination case on account of race. But with respect to the issue of wealth, the disparity turns on the discretionary application to the clemency board. In one instance, the applicant has to go through with a hearing if he can't pay. In the other instance, he can apply for discretionary relief on paper. Isn't that literally the holding? And the court says that doesn't violate equal protection. Well, Your Honor, you're absolutely correct that at the time Johnson was decided, there was far less of a right to restoration. There was, in fact, only the right to apply for discretionary clemency. As far as the distinction between those able to pay restitution and unable to pay restitution, those who could pay restitution could apply, as Your Honor said, without a hearing. There was, however, a waiver of that requirement for anyone who for any reason had not met the requirements of the without a hearing application. So the only distinction between those who had to apply with a hearing and without a hearing was that they had to request a hearing that they were not even required to attend. That waiver provision is greatly the basis on which the court ruled against plaintiffs in regards to their 14th Amendment claim. But the significant piece of that decision and specifically that footnote is the court was very clear about what standard applies. So the court determined that the Harper standard does apply in that context of rights restoration in Florida. Surely it could have come to the same decision applying a different legal standard to those circumstances, but it did not. And it's significant that it chose to apply. Let me ask the question this way. Holding aside Johnson for the moment and just speaking for myself, it seems to me, Johnson states an abstract principle but doesn't help you all that much because, in fact, the issue was a different one. But hold that aside. Is there any other case that you can cite us to that applied heightened scrutiny to something like you have here where a whole class has been disenfranchised lawfully because of their felonious convictions? Your Honor, the Bynum case did determine that it was a significant question and referred it to a three-judge panel. They're applying. Of course, the problem there, you're talking about that Second Circuit case, right? Yes, Your Honor. Yeah. The problem there is all the court was called upon to decide was whether the question was serious enough to require a three-judge court to examine it more specifically. Isn't that right? That's correct, Your Honor. But even so, the court there did speak to the concern and the significance of applying wealth-based distinctions in voting. Richardson itself remanded the question of uniform application of the law down to the state court. So while – so there is not – there's an indication that that's still a valid concern, the disparate treatment among different groups of those with a felony conviction. The Harvey case out of the Ninth Circuit, written by Justice O'Connor, by explicitly choosing not to speak to whether an – the as-applied question of whether somebody who cannot afford to pay can still be denied the right to vote, implied certainly that there was a difference in those two circumstances. Let me ask you, do you need to get to heightened scrutiny? I mean, couldn't an argument be made that rational scrutiny with enhanced attention because of the nature of the right that's involved, voting in particular? I mean, because there is a scarcity of cases that get you to heightened scrutiny. So let me ask you that. Your Honor, with either level of scrutiny, we think that the court properly ruled in our favor. As far as heightened scrutiny, as I described there, there are a line of cases on point. But even under rational basis, as applied to our plaintiffs, all of the justifications that the state puts forward are not rational. And generally, wealth is not germane to elections. How do you respond to your opponent's argument that he didn't ever quite admit, but he almost has to admit that there are no legitimate government interests as applied? But his main argument is, we don't look at it whether it's rational to these particular plaintiffs. We look at whether the general statute is rational. How do you respond to that? And answer my question that I posed to him. Are there cases saying that in an as-applied challenge, you do look to the rationality as to the plaintiffs to whom it's being applied, rather than the general nature, the general statute as a whole? So, Your Honor, to speak to your first question, first, of course, it is an as-applied challenge. And we have grounds to argue that it's irrational as applied to our plaintiffs. But even as legislation passed for the generality of cases, it is still irrational. The state of Florida itself has said that there is a minimal collection expectation for approximately 80% of the $1.1 billion debts that are owed to Florida, many of which are mandatory. Does that equate to persons who are truly unable to pay, or simply persons who do not pay? In other words, they are able, but they get away with not paying. There are two different statistics that I think are relevant, Your Honor. The 80% with minimal collection expectation includes both people who are indigent and unable to pay on that basis, and people who are currently incarcerated. Did we have any finding of fact from the trial judge about what percentage of the whole class the indigent were? Your Honor, the judge did not specifically find what percentage of the class of people with a conviction were broadly in Florida. But he did note the figure that I just stated. And that's in the appendix at 491. Right. But when I looked at it, he made no finding saying of this group, this percentage is pecunious and can't pay. That percentage is able to pay. He did not say that, Your Honor. That's correct. He did note that Florida itself does not expect that it will pay. Who has the burden to establish that? Assuming arguendo, we look to the neutral rule of general application and ask whether it's rational. Who has the burden of establishing that the exception essentially swallows the rule? That is to say, the indigent are so big a part of the whole that it makes no sense to ask the question of rationality so generally. Don't you have that burden? We do, Your Honor. And of course, as applied to our plaintiffs who have put in uncontested evidence into the record that they are unable to pay, we have certainly met that burden. All of the evidence in the record does, however, show that the state itself does not expect to get paid back for approximately three-quarters of the debt. So while the court may not have made a specific factual finding on the reasoning, the underlying report that he cites does say that it's because of indigent or incarcerated or notes that those folks are either indigent or incarcerated. Let me come back to Judge Anderson's question. Could I clarify? Could I clarify? Is it clear that they're just those two categories, indigent and incarceration, and not a third category of not incarcerated, not indigent, but get away with not paying? The Florida Clerks and Comptrollers report that we cite in our brief and that I believe the district court relies on gives for that 80% that they don't expect to be paid back from is incarcerated and indigent. Those are the two that are covered. So even if the report did not make a specific finding about why they didn't pay it back, when every single defendant comes out of the criminal justice system in Florida, if they have a conviction with hundreds of dollars in mandatory fees and oftentimes in addition to that restitution obligations for costs, I think if somebody is indigent and facing those fees, it's a small logical step to assume that that's the reason for their inability to pay back. Let me go back though again to Judge Anderson's question. Is there any case law or line of cases you can point us to that says we look at rationality with respect to the as-applied group rather than asking more generally as to whether it's rational to posit a neutral rule of general application, even if it falls disproportionately on a subset of that group? Yes, Your Honor. To your question and Judge Anderson's second question, the line of cases on wealth discrimination generally not specific to voting, Griffin, Bearden, Mayer, and Williams, they all treat the statutes that require payment in a similar way, which is they say it does invidiously discriminate because the fee requirement or the payment requirement is grossly disproportionate in application, meaning that a statute itself that says you must pay certainly on its face makes a determination based on money, based on ability to pay. So those are as-applied challenges. Right. But in every one of those cases, the court reaches out for heightened scrutiny of some kind, does it not? It does, Your Honor. None of those cases involve pure rational basis. Can I theorize a reason that arguably connects the means and the ends in some rational way? What I'm asking is whether there's anything in the law applying rational basis scrutiny to an as-applied challenge looking at a general rule and asks only its rationality as to the individual folks as applied rather than more generally. Well, Your Honor, of course, in the voting context, because heightened scrutiny applies, it would not cover those cases. Generally, for rational basis, I'm having trouble thinking of a case where 80-plus percent of those, of the only people affected by the law, in fact, there's no rational basis to apply it to them. So I think because— Well, the stat with the record shows that 80 percent of the putative class of re-enfranchised plaintiffs are unable to meet their obligations to pay a fine or restitution. Or was it 80 percent of the class simply had an obligation that had not yet been paid off? Your Honor, there's two different statistics that are important. Our expert was able to find that 80 percent of people within the set of Florida convictions, not including federal and out-of-state convictions, he was able to positively identify a number of records, 80 percent of whom had not paid. But as far as the Florida Courts and Comptrollers Report— But he did not say they cannot pay, simply that they did not. Do I have that right? He did not do that analysis at this point. He was just able to identify their outstanding debt, a high percentage of whom owe 500-plus dollars. With our individual plaintiffs, of course, who are at issue here, they have all submitted uncontested evidence that they cannot pay the amount assessed against them. The second statistic, along with Dr. Smith's report, is the Florida Courts and Comptrollers Report itself, which is where we get this 80 percent number of folks who are either indigent or incarcerated. So that is not a specific finding by the court that they were unable to pay. But given their indigence and the mandatory fines and fees across the board in Florida, I think that is a reasonable— You made one other comment that I was interested in. You said, even if the appropriate reference to these neutral rules of general application is the whole class of disenfranchised felons who have not performed all of the terms and Why is that so? Because the claim—if this were a facial challenge, and if we were looking at the state legislating for the generality of cases as opposed to as applied to those unable to pay, the generality of cases are unable to pay. The generality of cases in Florida are— So that turns on an empirical finding that the bulk of these folks can't pay. That does turn on a factual— And we do not have a finding about that, and I don't know how we could reach that and make that finding ourselves based on the record evidence here. Your Honor, I believe that the district court's recognition that Florida itself does not expect they'll be able to collect these unpaid legal obligations from about three-quarters of the people and the underlying reasons for that inability to collect, including indigence, is basis enough to speak to the generality of— So should we be making that finding a fact in the absence of a finding by the district court? Is that your view? No, Your Honor. I believe the district court in identifying and finding that over 75 percent of those who owe LFOs in Florida are indigent or incarcerated, that that provides a basis for this court to again, we're far down the road of plaintiff's claim, even if this were not an as-applied challenge. Let me ask just one other question. Your colleagues have raised an interesting argument about administrative burden. They say, if I have it right, that if the state is put to the burden of doing what you say they should be doing, that is to say, examine case by case, individual by individual, the genuine capability of paying restitution fines or fees, that the task is a formidable one, it's an expensive one, and will have the net effect of slowing the whole franchise. He says that's rational problem. That's rational ground to be cautious where court is sitting in equity. What about that? Your Honor, that's an important question, and I think what's significant about the district court's order is that it was very narrow. It left to the state to find an appropriate means to determine who is unable to pay, and the court itself, over the course of this case, had suggested different formulations that would not require an administrative burden. It suggested, for example, a checkbox on the registration form so that people could affirm their inability to pay outstanding legal financial obligations. Right, but presumably you'd require a form of some kind to be distributed. We're familiar with it. Bond hearings are held all the time. The magistrate judges in federal court issue a statement, and they say, fill it out. Do you have any assets? If so, what kind? Do you own any property? If so, where? Do you have an income? If so, how much? As a means of determining indigency for getting a lawyer, where the costs are substantially higher than the costs associated, in many instances, maybe most, for paying a fee, a fine, or maybe even restitution. Just strikes me as a substantial obligation. If the scrutiny is heightened, it wouldn't count for much. But if the scrutiny is rational, why wouldn't that be a fair factor for a court? Hitting inequity to consider in deciding whether to pronounce an injunction. Your Honor, as the district court has recognized, for most of those convicted in Florida, that process has already taken place. So another one of the court's suggestions for an administrable method that the state, the state itself could choose to administer this law, is that anybody who had been determined indigent at the time of their conviction, there could be a rebuttable presumption that they are unable to pay outstanding legal financial obligations. The court suggested at one point that there could be a rebuttable presumption that if somebody is receiving public assistance, that indicates another instance where their inability to pay has already been determined. So not only does the state, as Your Honor recognizes, in a number of different circumstances determine people's inability to pay, it has already done so for most of those who would be affected by this decision. The – a checkbox on the registration form, of course, would include an indication under oath on a form that somebody is already required to submit to the Department of Elections. So it does not involve any additional determinations, any one-by-one determinations on the part of the state. The state has not acted to find an administrable way to more broadly apply this since the decision in October. But that is on the state alone. The district court certainly permitted the state to construct its own solution that would decrease or minimize the administration. And in this regard, with respect to any of these felons except these plaintiffs, there is no order in the injunction that they be permitted to vote prior to establishing their indigency. Is that correct? Your Honor, I think that those – the plaintiffs – of course, the order applies specifically to them. The order puts those who are already registered to vote and have not under state law been removed from the rolls in a very difficult position of not being able to determine or facing the potential threat of prosecution should they go cast their ballot. So they have registered to vote. The Secretary of State has reviewed their application. The Supervisor of Elections has put them on the rolls. They have received a voter registration card. By all indications, they've been told that they should go cast their ballot on Election Day. The state, under state law, would have to take at least 37 days to notify somebody of potential removal from the rolls and offer them a hearing. So I don't believe that, in general, folks who are registered could possibly be removed in time for the registration deadline. But certainly, the state's failure to act on the district court's injunction does put a great number of people in a difficult situation of not having clarity from the state despite their receipt of a voter registration card and instructions for voting. They may not have clarity on what they would face should they go exercise their right. Wait a minute. Is what you're saying that a number of people have signed up and registered to vote who haven't finished paying their financial obligation? Since Amendment 4 and the legislation 7066 have gone into effect, the Department of State has continued to administer registration and elections by registering people who submit a facially sufficient voter registration form. So we can presume that those who have their rights, both because some people are not even aware of their outstanding financial obligations due to the recordkeeping of the state, and on the numbers alone, we can presume that some people who may have outstanding legal financial obligations submitted an application. The state itself reviewed it, both at the state level and at the county level, and they were registered to vote. And that ties into the not specific clarity amongst the state's records. Is that my correct? Yes, Your Honor. I think the difficulty here is that the state has not been clear, has not offered statewide instructions, even after receiving the district court's injunction, as to whether those who are unable to pay may remain registered and may cast their ballot. Any other questions? Any other questions? Thank you very much. Thank you very much, Your Honors. Ms. Lange? Good morning, Your Honors. And may it please the Court, Danielle Lange for the Plaintiff Appellees. It's important to remember that Harper is not just a foundational voting rights case, it is also a foundational wealth discrimination case. Thus, its rule that access to the franchise cannot be made to depend on an individual's financial resources is part of a much broader and unbroken line of cases, from Griffin to Harper to Bearden to MLB, that hold that the state cannot withhold access to an important right on the basis of wealth and cannot punish citizens by virtue of their poverty. SB 7066 does both. Harper not only cites the right to vote as a preservative of all of its rights— Let me ask you a question in that respect. What are we to make of the language that Justice O'Connor used in Harvey v. Brewer, where she wrote, and I quote, what plaintiffs are really complaining about is the denial of the statutory benefit of re-enfranchisement that Arizona confers upon certain felons. This is not a fundamental right. It is a mere benefit that, as the plaintiffs admit, Arizona can choose to withhold entirely. Therefore, we do not apply strict scrutiny as we would if plaintiffs were complaining about the deprivation of a fundamental right. I think the analogy to Bearden here is particularly important, especially given that Justice O'Connor wrote Bearden. Bearden is also a case about a statutory benefit. Actually, both cases are about a statutory benefit that extends a fundamental right that has otherwise been properly stripped of a criminal defendant. In the case of Bearden, a criminal defendant has been convicted of a crime and has been deprived of their liberty appropriately as a result of that conviction. The question of the statutory benefit that the Supreme Court has said you have no right to, it's a matter of grace, probation, and how that benefit that restores an important right of liberty is going to be allocated. And there, what Justice O'Connor said was that the critical distinction was between those who were unwilling to pay and unable to pay. And I think that has to be why Justice O'Connor made that explicit caveat in Harvey's that we are not talking about a case of inability to pay. And while she said that rational basis would be the mechanism. Even in that instance, right? She did. But it's interesting that her view was that rational basis scrutiny would obtain even if there was a wealth disparity that yielded a different result. Yes, but Judge Marcus, I think you had earlier asked the question of whether or not there was any rational basis case that was focusing on the rational basis as applied to a group. I would submit that Justice O'Connor was suggesting precisely that in Harvey. There would be no reason for her to make that caveat if you would just look at the general rule of applicability and not look at it as applied to people who are unable to pay. So I would submit that Harvey is precisely the case that you might have been asking about whether it existed. She certainly suggested that was the case. I think Cleburne is another case discriminating against the mentally disabled and as applied challenge there. I missed that. What case did you say? City of Cleburne. And sometimes these cases are called rational basis with bite cases. And I think it is a proper reading of Bearden. There's at least two ways to read Bearden. One is that there's a heightened scrutiny here. The other is that, you know, you're looking at something like rational basis with bite. And that's because. Well, but let's let's just stop at that for a moment. As I always understood rational basis, it meant that if I could come up with any rational explanation, whether the state offered it or not, for what they had done in terms of a statute or an ordinance, that was the end of it. It was constitutional. Whatever else Bearden did or didn't do, that's not the analysis in Bearden. Bearden is some form of heightened scrutiny. They don't say it's rational basis with bite. They don't say it's strict scrutiny, but they sure employ some form of heightened scrutiny. They analyze the interests of the state. They analyze the interests of the individual. They drill down and see how powerful each interest may be, and they come up with a conclusion. That's more than rational basis, isn't it? Yes, Your Honor. But I think that it's also more than the ordinary rational basis analysis to suggest that you would have to look at the rational basis as applied to people who are unable to pay, which is what and Harvey. It's important to note that Justice O'Connor didn't think that these labels of heightened scrutiny versus rational basis are particularly the appropriate framework in wealth discrimination cases. What she wrote in Bearden is that this cannot be put into a pigeonhole analysis and that slogans about heightened scrutiny, strict scrutiny would not be the appropriate framework. Instead, what she said is that we should look at the nature of the interest and we should look at the means that the state is choosing and whatever state's legitimate interest. You're right. That is a higher level of scrutiny, and that test was reapplied and restated in MLB. Doesn't it come down to how you frame the nature of the interest here? Because the state is saying the nature of the interest is not a fundamental right because you could take it away. Take it away, give it back, whatever the state decides, and that changes the nature of the interest so that it's no longer a fundamental right and not as important to justify whether you call it strict scrutiny, heightened scrutiny or rational scrutiny plus. Um, they are arguing that the nature of the interest is no longer a fundamental right because it's applied to felons who you can take it away from, right? Yes, Your Honor. That is what the state argues. However, it fails to reckon with any of the wealth discrimination cases in framing it that way because, of course, the right to liberty is very important and Justice O'Connor took that into account in Bearden, even though the right to liberty had been properly stripped from the individual in question and the only issue at stake was whether or not probation, a statutory benefit, an act of grace of the state was being either withheld or granted. So if we should want to equate the right to vote in this case with the freedom in Bearden, what authority do we have to do that? I think the authority is the Supreme Court's holding that the right to vote is preservative of all other rights. Certainly the right to vote, looking at it, as Judge Anderson said earlier, putting aside whether or not these individuals are entitled to vote notwithstanding their felony convictions, they are not. The nature of the interest is still one that the court has said is preservative of all other rights. So, of course, liberty is important, but permanent felony disenfranchisement, permanent exclusion from the political community is also an extraordinary punishment. And there's no reason to believe that the court, that the Supreme Court thinks that the right to liberty, a limited period of time for the right to liberty, is somehow much more important than the right that they have said is preservative of all other rights. But even, but you need not decide. What case did they say, was that Harper? Preservative of all other rights is in Reynolds v. Sims. It's also in a very old case, Yickwo. This has kind of been the bedrock of the Supreme Court voting rights jurisprudence is this idea. Plus, in addition, of course, you have the dicta in MLB that voting is an exception from the rational basis scrutiny. And then you have the entire line of cases, Griffin v. Illinois, down through Bearden, which are in the imprisonment, incarceration context instead of voting. Yes, Your Honor. Any other authority? So I would point to these as one line of authority, Your Honor. So Griffin v. Illinois, important to recognize, is not a case about any fundamental right. The court says repeatedly in its access to court cases that you don't have a right to appeal. After you've had the due process of a trial, you do not have a right to an appeal. And yet, in doling out that right to an appeal, you cannot discriminate on the basis of wealth. The case that came after Griffin was Harper. And Harper cites directly to Griffin for the proposition that wealth cannot be a factor in access to voting. And that's why I say that Harper is not just a voting rights case. It is a wealth discrimination case and clearly establishes that when the right to vote is doled out, the wealth discrimination cases apply. In fact, Harper stopped to note that the right to vote in state elections is actually found nowhere in the Constitution and said, we do not canvass here who has the right to vote and who does not. We only say that as you distribute the right to vote, you must do so in a way that does not discriminate on the basis of wealth. So the court did not assume that the plaintiff had some pre-existing fundamental right to vote. The court said, we're not deciding that question. But where you dole out the right to vote, you cannot do so in a way that discriminates on the basis of wealth. And that is precisely what SC-76 does. I did want to address briefly the defendant's claim or the state's claim that there is no facial classification here. And that's why rational basis should apply. That argument has been made in every fines and fees case that the Supreme Court has ever seen. And the argument has always failed. For example, in Williams v. Illinois, the court said, and the Illinois statutory scheme does not distinguish between defendants on the basis of ability to pay fines. But as we said in Griffin v. Corporation, and went on to say that by making payment of a fine the rule, it was treating two categories of people differently. All of that may be right. But doesn't that suggest that the scrutiny is more than rational basis scrutiny? I think it does, Your Honor. I think that we get where you want to go. We've got to do more than hypothesize a reasonable basis for a neutral rule of general application, right? We've got to do what Justice O'Connor laid out in Bearden. Whether analyzed in terms of equal protection or due process, and she's quoting from Justice Harlan, the issue cannot be resolved by resort to slogans, pigeonhole analysis, but rather requires a careful inquiry into such factors as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, and the existence of alternate means for affecting the purpose. That's the analysis she lays out there. Isn't that the analysis that your argument compels us to use? Yes, Your Honor. I think it's undeniable that that is what Bearden holds and that the defendants have not provided any rational reason why the Griffin, Harper, Bearden line of cases should not apply. I would point out that on page 16 of their reply brief, there's an assertion that the Griffin line of cases has been carefully circumscribed to the access to court cases. However, there are four Supreme Court cases cited after that proposition. None of them stand for that proposition. Three of them stand for the proposition. Three of them are cases about access to courts, and so the court talked about Griffin's application to access to courts, but the fourth one is important, and that is a case called Kajmas v. Dickinson's Public Schools, and that actually supports plaintiffs here. The issue at stake in that wealth discrimination case was a bus fee to get to school, and the distinguishing the Griffin, Harper, Bearden line of cases, the court did not say those are only about incarceration or those are only about access to courts. Instead, what they said is that that case was about circumstances in which the plaintiffs had no alternative because the state had a monopoly on the right or benefit at issue. So it said children can get to school other ways than by a public bus. Of course, we cannot, our clients cannot restore their right to vote without the state's permission. They have an entire monopoly, and so every time we've seen the Supreme Court. What was that case? I missed it when you said it. I have trouble pronouncing it, Your Honor. It's Kajmas v. Dickinson Public Schools. It's cited on page 16 of the reply brief, and the first word is K-A-D-R-M-A-S, and so the court has repeatedly laid out a wealth discrimination test. It has said that where the state has a monopoly, our wealth discrimination cases apply. Where the right to vote or the right to political participation more generally, our wealth discrimination cases apply. Where you are punishing someone for their poverty, our wealth discrimination cases apply, and I would note that I think the state has conceded that felony disenfranchisement is a punitive device. They're, all the legitimate interests that they rely upon are punitive ones, and in fact, Johnson v. Governor said that felony disenfranchisement is a punitive advice. So by any measure of the Supreme Court's wealth discrimination cases, that is the analysis, the analysis in Bearden that Judge Mark has outlined is the analysis that must apply here. But of course, I do submit that even under rational basis, particularly applying the kind of rational basis that Justice O'Connor suggests in Harvey, we succeed as well. Harper does not only say that the right to vote is at stake, and so we're applying closed scrutiny. It also says that introducing wealth in voting qualifications is, as a legal matter, introducing an arbitrary factor. In Griffin, the court said whether one is innocent or guilty is irrelevant to wealth. And in Bearden, they said that one's payment of LFOs when unable to pay is irrelevant to their rehabilitation. And so in all of these cases, the court is sounding in both rational basis and heightened scrutiny. So yes, Judge Marcus, clearly we believe that the scrutiny that's not pigeonholed, but rather case-specific in Bearden is what applies. But plenty of examples- Well, isn't what they're saying that you have to, even in rational basis, you have to have a rational basis to justify a discrimination on wealth. Isn't that what they're saying? Yes, Your Honor. And that's because the law addresses itself to actualities. While rules of general applicability are generally okay, I think what the court recognizes is that it's not really a rule of general applicability to say that if you can pay a fine, you must pay a fine. And if you pay a fine, you can get this. Why can't the state of Florida promulgate a rule that's designed and intended to incentivize felons to meet their restitutionary obligations to the victims of the crimes that they were involved in? That seems to me to be perfectly rational. It certainly can, Your Honor, and it does. There are plenty of mechanisms that the state of Florida already uses at its disposal for recoupment. It can place a garnishment on all of your wages. It can place a lien on your home. But they chose not to proceed that way. They chose to say, we will re-enfranchise you if you make your victims whole. That is to say, if you meet your restitutionary obligation. As a general matter, it might incentivize, right? It may not with respect to the particular plaintiffs, but as a general matter, might that not incentivize? And if the answer is yes, that would be perfectly rational, wouldn't it? Yes, Your Honor, as a general rule. But as we've been discussing, in the wealth discrimination cases, at minimum, the court must look at the rationality as applied to those who are unable to pay. And there the court has routinely said that trying to bring blood from a stone is not rational. In Zablocki, the court said nothing about a rule that would withhold the right to vote until you paid child support was going to make child support forthcoming from an indigent person. So the answer to the rational basis question turns on whether we look at the global sweep of the enactment or whether as applied. If we look globally, they win and you lose. If we look as applied, you win and they lose. Is that what it comes down to? In some circumstances, that might be the case. I mean, in this circumstance, isn't that how it would necessarily have to play out? So Judge Marcus, I think that's where your earlier questions about finding the fact about how many people fall within this category apply. And I just wanted to make a few additional points about the record in addition to what my colleague said. On page 5 of the district court's opinion, the court recognized that a great number of people arrested and charged with crimes are poor. One study using nationally representative data found that about 36% of people arrested once in 2017 and 49% of people arrested multiple times had individual incomes below $10,000 per year, well below the poverty level. I would also note that specifically the record and the clerk's report that has been discussed not only shows the kind of calculation of expectation of payment, it also shows that over 50% of outstanding LFOs have been converted to civil liens. And the district court made a specific finding of fact that conversion to civil liens is overwhelmingly the manner in which the state deals with individuals who are unable to pay at the time that they complete their sentence. And it is a way of taking those individuals out of the criminal justice system. And it's very notable that SB 7066 went out of its way to include even LFOs that have been converted to civil liens and say it's not sufficient, it doesn't say that you completed your term if they have been converted to civil liens, even though that is the state's mechanism for recognizing inability to pay and taking things out of the criminal justice system. So just as in Bearden, the criminal court had found that there was no longer any reason for incarceration, in the cases of civil liens, the courts have found that there's no reason for any more punishment, for any more involvement in the criminal justice system. And yet SB 7066 sweeps in those individuals. And that's where someone like Plaintiff Fraser comes into play. Her legal financial obligations have been converted to civil liens and the court has found that she is unable to pay any more than $25 per month, which she is doing. But under that payment plan, she will not be able to vote for another decade. She has been undeniably denied the right to vote in this upcoming election and every upcoming election for the next decade by virtue of her poverty, and that's precisely what the Constitution does not permit under the Griffin-Harper-Bearden line of cases. Finally... I believe we have your case. Thank you very much, Your Honor. If you have no further questions, we would ask that you affirm the District Court's narrow and thoughtful injunction. Thank you, Your Honor. Mr. Lang? You, Mr. Patterson, are you... Patterson, yes, I am Mr. Patterson. Okay, all right. Yeah. Yes, just a few points quickly, Your Honor. First of all, the Harper line of cases does not apply because there's no fundamental right to vote at stake. The second, third, pre-split fifth, sixth, and ninth circuits have all held that in disenfranchisement and re-enfranchisement cases, Harper is simply irrelevant. It's rational basis review. This Court would be innovating if it were to apply anything other than rational basis review. Opposing counsel pointed... However, there are only two cases on point, really, and that's the Sixth Circuit majority and the Madison v. State. All the other cases are distinguishable in the same manner that Shepard is distinguishable. Is that not true? Well, they didn't involve this specific question, but they're on point in the sense that it was a felon re-enfranchisement and disenfranchisement case, and the ruling was that in the general run of those cases, rational basis review applies. And the Washington Supreme Court and the Sixth Circuit are the only ones to address this specific question, and they've all gone our way, too. Again, this Court would be the first to take a contrary position if it were to do that. Opposing counsel points to the Bynum case. Of course, that was pre-Richardson. It didn't decide the question, and later in Hayden, the Second Circuit applied rational basis review in a disenfranchisement case. There are no findings of fact from the District Court about what percentage of people would not be able to pay, but even if... And there was still this statute. It would still be entirely rational, because the view of the people in Florida was unless and until you repaid your debt to society in full, that is the qualification to vote, and that's an entirely rational qualification. This is nothing like the right in Bearden, where the individuals had been granted probation. They were free. They had a right to freedom, albeit a qualified one, and as the Supreme Court had said in Morrissey, that is a right that is respected in the Constitution. That is why Justice O'Connor, who wrote Bearden, and Harvey, and all the other courts who addressed this issue have said that this is different. There is no right to vote until you've met the qualifications. Also, another thing distinguishing this case, MLB synthesizing some of these cases has said that these wealth classifications affected only the indigent. That is not what's at stake here. One of the plaintiffs has $52 million in outstanding fines and restitution. As they themselves said below, a person could be quite wealthy and still be prevented from voting, given that type of obligation. So this is not a classification that affects only the indigent. What about... Wait, wait, wait. What did you just say? I said this classification does not affect only the indigent. A person could be a multimillionaire, but if they had $52 million in outstanding fines and restitution, not be able to vote, and they would still be within their claim. Their claim is inability to pay. It's not indigency. One last thing, Your Honor, is that the people of Florida have drawn the line between full repayment to society and not full repayment. If this court were to hold that plaintiffs are right, that that is unconstitutional, then under established severability principles, under Florida law, and as the United States Supreme Court has said, in these types of cases, you have to determine whether you extend the benefit to the excluded class or you rescind the benefit altogether. In this case, it's crystal clear that in the 2017 advisory opinion case, the Florida Supreme Court said that the chief purpose of Amendment 4 was to extend the franchise to felons who have completed the full terms of their sentence. If the answer from the federal courts is that you cannot make that determination, we've frustrated that chief purpose, then the result would be an injunction saying that no— You know, there's some case law out there suggesting that if you're before a court on a preliminary injunction rather than a final determination, there's some wisdom in avoiding the severability question. Can we do that here? Can we fairly say we've got a very slender record, surely incomplete on a lot of critical facts, and we're just not going to get to the severability question now, even though it may obtain at a later point when we have a full record? Would that not be a reasonable answer to you, even if you ultimately turn out to be right? That would not be a reasonable answer in this circumstance because the result would be an injunction saying that these plaintiffs can vote, and even the district court recognized it's an irreparable harm to the state and to the other eligible voters in the state if ineligible voters are allowed to vote. Last question on that. Are we bound to the Florida rules of severability in making this analysis? Yes, and those rules of severability in Catalano and Schmidt make very clear that one thing you can't do is write terms into legislation versus just excising terms, and that's what as we put it in our reply brief, that's exactly what the district court's injunction effectively does. And second, even putting that to the side, you look to the purpose, and the purpose here is clear as the organizations affiliated with Plaintiff's Council and their campaign literature emphasized that this amendment required the full repayment, including fines and restitution. Internal documentation in those organizations indicated that that was critical to getting to the 60% threshold. So under those principles, the whole thing would need to fall. Of course, that's not what we're asking for. Our submission primarily is that this was a constitutional decision for the people of Florida to make. Thank you, Your Honors. Thank you. Let's take a break. If that suits you. Sure. Do you want to take a break? Go to being recessed for five minutes.